HARRY E. CRANDALL

*vs.*

WALKER D. HINES, Director General of Railroads.

Aroostook.   Opinion December 10, 1921.

*In an action to recover damages to property resulting from a collision at a grade crossing of a railroad, alleging negligence, it is unnecessary to consider the alleged negligence of defendant, if it appears from the direct examination of the plaintiff that he was manifestly guilty of contributory negligence.*

In the instant case it is unnecessary to state the case further than appears in a page and an half of the testimony of Lloyd Justus Crandall, a minor son of the plaintiff, who was driving the team.

It is not necessary to discuss the alleged negligence of the defendant. For, upon the assumption that it was negligent, the testimony of the minor son, Lloyd, on direct examination proves that he was manifestly guilty of contributory negligence.

On motion for new trial and exceptions by defendant.   An action to recover damages for the loss of a horse and injury to a farm wagon resulting from a collision with a train of defendant at a grade crossing, alleging negligence of defendant.   Plea, the general issue.   At the conclusion of the evidence counsel for defendant moved that the presiding Justice direct the jury to return a verdict for the defendant, which was denied, and defendant excepted.   A verdict for $375.00 in favor of plaintiff was returned by the jury, and defendant filed a general motion for new trial.   Motion sustained.   New trial granted.

Case is sufficiently stated in the opinion.

*Charles P. Barnes,* for plaintiff.

*Cook, Hutchinson & Pierce, Frank P. Ayer, Henry J. Hart, and James C. Madigan,* for defendant.

SITTING: CORNISH, C. J., SPEAR, PHILBROOK, DUNN, WILSON, DEASY, JJ.

SPEAR, J. This is an action to recover damages for injury to property through the alleged negligence of the operatives of the Bangor and Aroostook Railroad.

On the twenty-seventh day of November, 1919, about ten minutes past six o'clock, the plaintiff's son, a minor, a little over fifteen years of age, was driving his father's team when the accident, by collision, at a grade crossing, occurred by which the wagon was demolished and one of the horses rendered entirely worthless.

It is unnecessary to state the case further than appears in a page and a half of the testimony of Lloyd Justus Crandall, the son who was driving the team.

Namely:

"Q. On the afternoon of the day the horse was killed what time did you leave home?

A. Five o'clock.

Q. Where did you go?

A. To Paul Nadeau's.

Q. How far is Paul Nadeau's from your father's house?

A. About a mile.

Q. Is he a farmer?

A. Yes.

Q. What did you get for a load over there?

A. I got five bags of oats.

Q. Is that all you had on the wagon?

A. Yes.

Q. As you came back after you passed George Crandall's house you turned in on this Grant Road, did you not?

A. Yes, sir.

Q. That is before you reached the railroad?

A. Yes.

Q. And as your horse was traveling along approaching the railroad, one hundred or more feet back from the railroad, were you sitting on the wagon driving?

A. No.

Q. What were you doing?

A. Walking.

Q.   Where?

A.   Behind the team.

Q.   Now you may state what you did?

A.   I stopped the team, looked and listened and then got on after the noise had died away so that the horse got quieted down.

Q.   Do you know how far away from the track the horses were at the point where you stopped?

A.   About sixty feet.

Q.   When you got ready to start that day where were you on the wagon?

A.   I was sitting down on a bag of oats.

Q.   Where were the reins?

A.   In my right hand.

Q.   Did you hear any whistle?

A.   No.

Q.   Did you hear any bells?

A.   No.

Q.   How rapidly did you drive the horses towards the crossing?

A.   Two miles and a half an hour probably.

Q.   That is, were you walking?

A.   Yes.

Q.   What was the first thing you knew of that railroad train?

A.   I see it about fifty feet away when I was on the track.

Q.   How far on the track was the team when the engine collided with it?

A.   The wagon was just started on; the horses was part of the way over.

Q.   Were you thrown off the wagon?

A.   Yes."

It is not necessary to discuss the alleged negligence of the defendant. For upon the assumption that it was negligent, the testimony of Lloyd, as given above, on direct examination proves that he was manifestly guilty of contributory negligence.

His case falls so clearly within the facts and the law announced in *McCarthy, pro ami* v. *Bangor and Aroostook R. R. Co.*, 112 Maine, 1, that further discussion would seem unnecessary.

In that case the plaintiff was a boy of fourteen years of sufficient intelligence to appreciate the danger of being run over at the crossing. This is true of the boy in the present case. In that case the boy

said he stopped his team twice to look and listen, the last time about fifty feet from the track. He said he could not see the approaching train on account of bushes on the right and a bank left by grading. This is what is claimed in the present case.

In that case the court say, assuming the crossing to be blind and dangerous as the plaintiff describes it, there was all the more need of watchfulness on the plaintiff's part. At an ordinary crossing, a burden is put upon the traveler to be observant, to look and listen, and to stop, if need be. Much more at a blind crossing. The same duty rested upon the driver of the team in the present case.

In that case the court further say, "Now if the plaintiff had stopped last at a distance of twenty or even fifty feet, from the track and actually listened, it is in the opinion of the court, incredible that he should not have heard the noise and roar of the onrushing train."

The driver in the present case says he did stop and look and listen "about sixty feet" from the track; that he then got upon his load and went ahead at the gait of two and one-half miles per hour, in the meantime looking for the train in both directions, and admits that he could see a train one hundred and fifty feet from the crossing, at a point even sixty-five feet away, as appears from the following question and answer:

"Q. Assuming this sixty-five feet, that point is from the crossing this way, do you mean you could only see one hundred feet from the crossing east from that point?

A. You could see a matter of one hundred and fifty feet."

In the language of the McCarthy case, "We think the case shows beyond question that if the plaintiff had looked just before the horse went onto the crossing, he would have seen the train where it was."

In answer to the argument of obstructions to the view the court in that case goes so far as to say: "In any event as we have already said there was a point where if he had looked he could have seen the train and stopped his team, before he entered upon the track."

That the driver could have done this in the present case is manifestly clear from his own testimony. But in the present case as in the McCarthy case, the plaintiff contends that if the usual signals are not given, a traveler is not held to that degree of diligence that he would, had the company discharged its duty. But the court held that such want of signals does not discharge the traveler of all care not to listen, or having listened and heard, when the plaintiff says

a train could not be seen until the traveler was on the track, is clearly a want of requisite care, even if it be true that no crossing-signals were given.

All the above principles of law are fully reviewed in the McCarthy case, and it is therefore unnecessary to further allude to them.

We are of the opinion, under the above rules of law of which we fully approve, that it is incredible that the driver of the plaintiff's team, could not both hear and see the approaching train with which the team collided, even upon an interpretation of his testimony most favorable to plaintiff's contention.

The driver of the team was clearly guilty of contributory negligence.

*Motion sustained.*
*New trial granted.*